where he was located when police entered the market. (Tr.I-188) One hundred dollars was found on the defendant. (Tr.I-165) The only drugs found at the Belmont Avenue address were found hidden in the basement of the market. (Tr.I-136)

Although it could be reasonably inferred that if the defendant worked at the store he may have had reason to go to the basement, "[p]resence and awareness alone do not constitute evidence which warrants an inference of ability and intention to exercise control of the illicit substance." Commonwealth v. Brown, 34 Mass. App. Ct. 222,226 (1993). Further, the drugs found in the basement were not in plain view, but were hidden inside a bag stuffed between milk crates. (Tr.I-136) Although it may be reasonable to infer that the defendant had access to the basement, there is no evidence from which one could infer that he had knowledge of drugs that were hidden there.

The defendant had one hundred dollars in U.S. currency on him when he was arrested. This evidence, taken in the light most favorable to the Commonwealth may be suggestive of drug sales. However, it pales in comparison with the $460 found on the defendant in

Commonwealth v. Navarro where the Court commented that the amount of cash, "does create suspicion about the defendant's activities. However, 'it is not enough for the appellate court to find that there was some record evidence, however slight, to support each element of the case.'" Commonwealth v. Navarro, 39 Mass. App. Ct. 161, 169 (1995)(insufficient evidence to support conviction), quoting, Commonwealth v. Armand, 411 Mass. 167, 170 (1991).

The defendant was also seen going from the market to his brother's apartment at the Orange Street address three or four times. Taken in the light most favorable to the Commonwealth, this evidence suggests that the defendant was aware of drugs at the Orange Street address. Such knowledge or awareness is not enough to permit a rational trier of fact to find proof beyond a reasonable doubt that the defendant had the ability and intention to exercise dominion and control over the drugs.

Contrary to the Commonwealth's assertions, the Commonwealth failed to offer any additional incriminating evidence which would permit a rational trier of fact to infer constructive possession from the defendant's mere presence at the market. Taken in

the light most favorable to the Commonwealth, the evidence was insufficient to prove that the defendant had knowledge of the drugs hidden in the dirt basement of the store or that he had the ability and intention to exercise dominion and control over them.

The only evidence offered to prove the defendant's possession and intent to distribute the cocaine found at the Orange Street address was observations of the defendant going to that address three or four times and some pill bottles with the defendant's name on them which were found in a closet in close proximity to a pair of pants which contained a few grams of cocaine (Tr.II-19,21)

The pill bottles and the pants were found in the front bedroom. (Tr.II-19) With the exception of the small quantity of cocaine found in the pants in the closet, all of the cocaine found at the Orange Street address was found in the back bedroom. (Tr.I-230,238,240,241) Packaging materials were found in the kitchen. (Tr.II-30-34) A drug ledger was found in a rear bedroom. (Tr.II-13,14)

A phone bill in the name of the defendant's brother, Silvio Ali, and a number of cancelled checks

signed by the defendant's brother were also found in the apartment. (Tr.II-36,37,39)

Police testified that the defendant gave his address as 392 High Street in Holyoke when he was arrested and no evidence, other than the pill bottles was offered to show that the defendant lived at the Orange Street address. (Tr.II-194,195)

Taken in the light most favorable to the Commonwealth, the evidence presented with respect to the Orange Street address permits the inference that the defendant was aware of the drugs at this address. The presence of a few pill bottles with the defendant's name on them in a room other than where the large amounts of cocaine and packaging materials were found is not enough to permit an inference that the defendant had the ability and intention to exercise dominion and control over the drugs found.

Although presence, supplemented by other incriminating evidence will serve to tip the scale in favor of sufficiency, no other incriminating evidence was presented here and the Commonwealth points to no other evidence in its brief. Commonwealth v. Ramos, 51 Mass. App. Ct. 901, 902 (2001) quoting Commonwealth v. Arias, 29 Mass. App. Ct. 613, 618 (1990) and

Commonwealth v. Brzezinski, 405 Mass. 401, 409, 410 (1989). "There must be additional significant evidence, an additional 'plus' factor of other incriminating evidence if a case is to reach the trier of fact." Commonwealth v. Antonio, 45 Mass. App. Ct. 937, 938 (1998).

There was no evidence, other than the proximity of the pill bottles, to suggest the pants containing cocaine belonged to the defendant. There was ample evidence from which to infer that the pants belonged to his brother, such as the phone bill and cancelled checks bearing his brother's name.

"**Mere presence in the vicinity of a controlled substance, even if one knows that the substance is there, does not amount to possession … Nor is possession proved simply through the defendant's association with a person who controlled the contraband … or by sharing the premises where the narcotics were found.**" Commonwealth v. Cruz, 34 Mass. App. Ct. 619, 622 (1993), quoting Commonwealth v. Booker, 31 Mass. App. Ct. 435, 437-438 (1991).

Trial counsel thrice moved for a required finding of not guilty: once at the close of the Commonwealth's case, once at the close of all of the evidence, and

- 18 -

again post verdict. (Tr.III-46; R.-16-19) It was error to deny these motions where the evidence, taken in the light most favorable to the Commonwealth, was insufficient to prove the essential elements of the charged offenses.

CONCLUSION

The Commonwealth argues in its brief on appeal that *mere presence* at the market and two pill bottles at the apartment are sufficient evidence to prove the defendant's constructive possession of more than one hundred grams of cocaine. Case law in this Commonwealth has repeatedly held that mere presence, even coupled with awareness of drugs, association with someone who controls drugs or sharing premises where drugs are found is not enough to prove possession. Commonwealth v. Cruz, 34 Mass.App.Ct. 619, 622 (1993); Commonwealth v. Brown, 34 Mass.App.Ct. 222, 226 (1993). The defendant asks this Court to reverse his convictions on indictments 99-815 and 99-816 because the Commonwealth failed to present evidence sufficient for a rational trier of fact to find all of the

elements of trafficking in cocaine beyond a reasonable doubt.

                        Silfredo Ali

                        By his attorney,

                        */s/ Elizabeth Lutwak*
                        Elizabeth Lutwak
                        BBO# 630459
                        P.O. BOX 1402
                        Marblehead, MA 01945
                        (781)639-9342

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

01-P-1098

COMMONWEALTH

vs.

CLEBIS LEBRON

(and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

Codefendants Lebron and Ali claim on appeal that they were entitled to required findings of not guilty on indictments charging them with trafficking in cocaine. See G. L. c. 94C, § 32E(b)(2). Ali also argues that his trial attorney's failure to request severance of his trial from that of Lebron requires reversal of his convictions on the basis of ineffective assistance of counsel. We affirm.

1. The defendants' motions for required findings of not guilty. Based upon our review of the transcripts, we do not recite the evidence but instead accept the well-documented statement of facts set out in the Commonwealth's memorandum of law in support of its motion for summary disposition (at 1-12). Taking the evidence in the light most favorable to the Commonwealth, see Commonwealth v. Johnson, 435 Mass. 113, 118 (2001), and the cases therein cited, and for the reasons set out in specific detail in the Commonwealth's memorandum (at 13-19),

---

[1] The companion cases are against Silfredo Ali.

R.-1

we conclude that the motions for required findings of not guilty were correctly denied.

2. <u>Ali's claim of ineffective assistance of counsel</u>. On this issue Ali claims that his defense was incompatible with that of Lebron and that his trial attorney was ineffective in failing to file a motion to sever on the basis of mutually antagonistic defenses.

It is not ineffective for counsel to fail to file a motion that would not have been allowed. See <u>Commonwealth</u> v. <u>Kruah</u>, 47 Mass. App. Ct. 341, 347 (1999); <u>Commonwealth</u> v. <u>Hunt</u>, 50 Mass. App. Ct. 565, 568 (2000). Ali acknowledges, as he must, the fact that Lebron's attorney twice sought severance without success on the same ground here presented: mutually antagonistic defenses. (Brief at 22-30). If there was no showing of mutual antagonistic defenses on Lebron's motions, we think it difficult to conclude that Ali could have made such a showing on any motion for severance.

Moreover, we see no error in the denials of Lebron's motions. There was sufficient evidence to connect both defendants with each other and the two premises. This was hardly a case in which the "only realistic escape for either defendant was to blame the other." <u>Commonwealth</u> v. <u>Moran</u>, 387 Mass. 644, 659 (1982). See also <u>Commonwealth</u> v. <u>Smith</u>, 418 Mass. 120, 125-

2

R.-2

126 (1994).

                                          <u>Judgments affirmed</u>.

                                          By the Court (Perretta, Grasso
                                              & Kafker, JJ.),

                                              *[signature: Ashley Ahearn]*
                                                    Clerk

Entered:   December 23, 2002.

3

R.-3

COMMONWEALTH OF MASSACHUSETTS
APPEALS COURT

HAMPDEN COUNTY                                                A.C. NO. 01-P-1098

COMMONWEALTH

v.

SILFREDO ALI AND CLEBIS LEBRON

<u>COMMONWEALTH'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY DISPOSITION</u>

<u>ISSUES PRESENTED</u>

I.  WHETHER THE EVIDENCE TOGETHER WITH THE INFERENCES WHICH MIGHT REASONABLY BE DRAWN THEREFROM, WHEN VIEWED IN THE LIGHT MOST FAVORABLE TO THE COMMONWEALTH, WAS SUFFICIENT TO PROVE THAT BOTH LEBRON AND ALI WERE TRAFFICKING IN COCAINE?

II. WHETHER COUNSEL FOR ALI WAS NOT INEFFECTIVE IN FAILING TO PRESENT A MOTION TO SEVER WHEN THE SAME MOTION WAS TWICE DENIED WHEN PRESENTED BY COUNSEL FOR THE CO-DEFENDANT, LEBRON?

**STATEMENT OF THE CASE**

The Commonwealth is not dissatisfied with the defendants' Statements of the Case.

**STATEMENT OF THE FACTS**

<u>The Commonwealth's Case</u>

Sometime in October of 1998, members of the narcotics bureau began investigating activities at two locations, Moises Market, located at 150 Belmont Avenue, and a three-family dwelling located 137-139 Orange Street in Springfield. (Tr. 3, pp.

1

R.-4

122-123).[1] Initially, two Dominican males, Clebis Lebron and Franklin Garcia, were the "targets" of the investigation. (Tr. 3, pp. 195-196; Tr. 4, pp. 79-80). "Clevy" or "Cleby" and "Frankie" were the names given to the police by the informant. (Tr. 3, pp. 201, 203). When police checked the business records on file in the City Clerk's Office, they confirmed that in 1996 a business certificate had been issued for Moises Market, listing "Clevy" Lebron as the "conductor of business" at Moises Market, 150 Belmont Avenue. (Tr. 3, pp. 179-183; Tr. 4, pp. 76-77; C.A. 9).

Officers Lozado and Kervick conducted periodic surveillance of Moises Market, usually trying to observe the market around closing time in order to determine who had keys to the store and to follow the workers as they left the market. (Tr. 3, p. 125; Tr. 4, p. 108). Initially, the observations focused on "Cleby" or "Clevy" Lebron and Franklin Garcia.[2] Officer Lozado testified that he first noticed Lebron in the market towards the end of October 1998. During October and November, he observed Lebron behind the counter of the market at least five or six times. (Tr. 3, pp. 127, 179; Tr. 4, p. 108). Lozado saw Lebron using

---

[1] Abbreviations used in this brief are as follows: Tr. #, p. # refers to the Transcript volume number and page number; Def. Ali Br. # refers to the Brief submitted by the defendant, Silfredo Ali; C.A.# refers to the Commonwealth's Record Appendix, page number.
[2] Franklin Garcia was arrested and charged along with Lebron and Ali, but was in default at the time of trial and remains in default as of March 2002. (C.A. 10).

2

R.-5

keys to lock up the market at closing (Tr. 3, p. 130, 185), and he followed Lebron from 150 Belmont Avenue to 137-139 Orange Street about three times. Lozado testified that one time Lebron stayed at the Orange Street apartment for the night. More frequently, Lebron would go to the third floor apartment for brief periods of time, five or ten minutes, and then return to the market. (Tr. 3, pp. 128-129, 193). Usually Lebron would park out in front of 137-139 Orange Street and walk down the driveway to the rear of the house, setting off the motion detector lights. After Lebron entered the building, lights would go on in the third floor apartment and remain on for a brief period of time. The lights would go out, Lebron would reappear, get in the car, and return to the market. (Tr. 4, pp. 81-82; Tr. 5, pp. 20-21, 37-38). Lozado also observed Franklin Garcia at Moises Market and saw Garcia make quick trips to and from the market and 137-139 Orange Street. (Tr. 3, p. 130; Tr. 4, p. 81).

On December 7, 1998, Officer Efantis was assigned to mobile surveillance of 150 Belmont Avenue. He followed a car, registered to Silvio Ali, driven by one Hispanic male from 150 Belmont Avenue to 137-139 Orange Street. (Tr. 5, pp. 20-21, 31). Officer Efantis contacted Officer Brian Moriarty, who was assigned to surveillance at 137-139 Orange Street at the time. Officer Moriarty identified Clebis Lebron as the man he saw arrive in that car, stay a short time, and leave. (Tr. 5, pp. 37-38).

R.-6

A fourth individual, Silvio Ali, was seen working in the market during the early stages of the investigation. However, he was arrested on November 5, 1998 and was "out of the picture" for the rest of the investigation. (Tr. 3, p. 184; Tr. 4, pp. 183-184). The record does not reveal the reason for the arrest of Silvio Ali, but it does not appear to be related to this investigation.

Silfredo Ali, also referred to as "Freddie" (Tr. 4, p. 80), was observed in the market late in November or in early December, and was in the market when the search warrant was executed on December 11, 1998. (Tr. 3, p. 132; Tr. 4, p. 82). Silfredo's activities appeared to be consistent with working in the market, and Silfredo was also observed traveling to and from the market and 137-139 Orange Street. On one occasion, Silfredo Ali was observed staying at the Orange Street address for about one hour. Other times, he remained there for only ten or fifteen minutes before returning to Moises Market at 150 Belmont Avenue. (Tr. 4, pp. 82-83, 85).

Police sought and obtained search warrants for both Moises Market at 150 Belmont Avenue and the third floor apartment at 137-139 Orange Street. The warrants were executed simultaneously on December 11, 1998.

Officers Lozado, Maldonado, Petrie and Tardiff arrived at 150 Belmont Avenue at about 6:15 or 6:30 P.M. Both Clebis Lebron and Silfredo Ali were behind the counter when the police arrived.

4

R.-7

Lebron and Ali were advised that the police had a search warrant for the premises. They were handcuffed and secured. (Tr. 3, 123-133). A search of Lebron revealed two keys to the market and $53.00. (Tr. 3, pp. 134-135, 185, 190, 209). Silfredo Ali had $100 on his person. (Tr. 3, p. 165). $276 was taken from the cash register, and $58 was found in a sugar box behind the counter. (Tr. 3, pp. 208-209).

Officer Lozado went down into the basement. He observed Officer Maldonado[3] recover paper bags secreted between crates set up next to a bed in the basement. The paper bags contained plastic bags, which contained white powder. (Tr. 3, pp. 135-138, 191-192). The powder was analyzed and determined to be 42.05 grams of cocaine. (C.A. 5). Some paperwork was also recovered from the market. One envelope was addressed to Clebis Lebron at Moises Market, 150 Belmont Avenue. (Tr. 3, pp. 188-189). Bank statements (Ex. #2) were also recovered from the market. (Tr. 3, pp. 209-210). There was a stipulation that all of the checks contained in the statements seized from the market were signed by Silvio Ali. (Tr. 3, pp. 222-223). The telephone bill and title to a Chevrolet van which were seized were also in the name of Silvio Ali. (Tr. 3, p. 224).

At about the same time, a team of police officers arrived at 137-139 Orange Street to execute a search warrant for the third

---

[3] Officer Maldonado did not testify at trial because he was on military leave. (Tr. 3, pp. 132-133).

5

R.-8

floor apartment. They met Franklin Garcia on the steps as they were going up to the apartment. Garcia was secured, searched and arrested. (Tr. 4, pp. 47, 88). Officer Michael Dowd went to the back bedroom where he observed three piles of cocaine on plates on the floor. A vise and a lamp were also on the floor next to the plates with the piles of cocaine. There was packaging material in the immediate vicinity. (Tr. 3, pp. 230-237; Tr. 4, pp. 48-50, 89). There were razor blades and cards to cut and mix cocaine, sifters, a digital scale, duct tape and a ledger found in that room. (Tr. 3, pp. 242-252; Tr. 4, pp. 53-58). Cocaine encased in packaging material was clamped into the vise. Lt. Cook, who had substantial experience in narcotics investigations, explained that after cocaine was diluted it would be repackaged and the vise would be used to press it back into a hard lump to make it appear to be straight from the kilo. (Tr. 4, pp. 50-51, 90). The three piles of cocaine weighed 2.25 grams, 57.61 grams and 51.74 grams respectively. (C.A. 1, 2, 8). In that same bedroom, two more bags of cocaine were found in two separate gym bags next to the bed. One bag contained 3.38 grams of cocaine and the other contained 8.85 grams of cocaine. (Tr. 3, pp. 238-241; C.A. 3, 4).

Officer Tiyra Johnson searched the middle room, which appeared to be the living room. She found currency in the amount of $573 along with receipts and coins in a box in the closet. (Tr. 4, pp. 12-13). Officer Johnson also looked under the

6

R.-9

mattress in the rear bedroom and found what appeared to be a "drug ledger." (Tr. 4, pp. 13-14).

Officer Witherspoon searched the front bedroom. He found a bag containing 4.35 grams of cocaine in the pocket of pants hanging in the closet. (C.A. 6). On the shelf right above those pants, he found prescription bottles and two prescriptions in the name of Silfredo Ali, dated November 16, 1998. (Tr. 4, pp. 19, 23; C.A. 7).

Officer Pedro Soler searched what appeared to be a storage closet off the middle room. There was a box with many personal papers, including the phone bill for 150 Belmont Avenue and an insurance policy for 150 Belmont Avenue. (Tr. 4, pp. 27-28, 36, 42). These documents were in the name Silvio Ali. (Tr. 4, p. 37). There was also a bank statement addressed to Clebis Lebron, dba Moises Grocery, 150 Belmont Avenue. (Tr. 4, p. 38). The parties stipulated that the checks in the statement were not signed by Clebis Lebron. (Tr. 4, p. 40).

Officer Soler searched the kitchen where he found materials commonly used for packaging drugs in the trash can. There were many "blowouts," or plastic sandwich baggies with the corners torn off. (Tr. 4, pp. 30-32, 51). In addition to the orange sifter found in the rear bedroom, two more sifters were seized from the kitchen. (Tr. 4, p. 34).

On cross-examination of Officer Kervick, counsel for Silfredo Ali elicited testimony that Silfredo Ali have given a

7

R.-10

Holyoke address and occupation at the time of booking. (Tr. 4, pp. 194-195, 203).

According to the analyses, 42.05 grams of cocaine were seized from 150 Belmont Avenue (C.A. 5), and a total of 128.18 grams of cocaine from 137-139 Orange Street. (C.A. 1,2,3,4,6,8).

<u>Clebis Lebron's Case</u>

Lennox Stamp testified that he had owned the property located at 150 Belmont Avenue for about ten years. He leased it to "a guy on Main Street, and the lease was open." (Tr. 5, p. 56). Some time before 1998, the lease was assigned to Silvio Ali. (Tr. 5, pp. 55-56). Mr. Stamp testified that he still owned the property and that, as of June 23, 2000, the property was being utilized by Clebis Lebron as a variety store, named Moises Market. (Tr. 5, p. 56).

Mr. Stamp had met Silvio Ali and knew Frankie Garcia but was vague about whether he knew any other people in the courtroom. (Tr. 5, p. 57). He did not see Clebis Lebron at 150 Belmont Avenue. (Tr. 5, pp. 57-58). Stamp testified that he met Lebron through Lebron's wife, whose name he did not know because he "only dealt with her a couple of time and because they're Spanish." (Tr. 5, p. 58).

Juan Rondon testified that he lived on the second floor at 137-139 Orange Street, property owned by his wife and daughter. (Tr. 5, p. 61). Sometime in the fall of 1998, he rented the third floor apartment to Silvio Ali. Franklin Garcia and Silfredo Ali also lived there. (Tr. 5, pp. 61-62). Clebis

Lebron did not live there in November or December 1998, although he did see Lebron there twice after the raid. Lebron stayed there with his wife, Silvio's sister. (Tr. 5, pp. 62-66). On cross-examination,[4] Rondon testified that he entered into a verbal lease with Ali in April or May of 1998. (Tr. 5, p. 68). Silvio worked at a store on Belmont with Franklin Garcia. (Tr. 5, pp. 68-69). Rondon saw Silfredo at Orange Street at various times of the day, three or four times a week. (Tr. 5, p. 69).

The defendant Lebron offered testimony in the nature of an alibi. It should be noted that there was no notice of the defense of alibi and the Commonwealth strenuously objected to the receipt of this evidence. (Tr. 3, pp. 12-20; Tr. 4, pp. 110-132, 138-139).

Marcella Lebron, Clebis Lebron's mother, testified that she lived in the Bronx, New York. (Tr. 5, p. 72). She testified that her son lived with her in New York in December 1998. (Tr. 5, p. 73). Immediately thereafter, she testified that in 1998 Clebis Lebron lived with his girlfriend, Vilmalia, and their son at Vilmalia's apartment, which was not close to hers. Clebis would live with his mother when he had problems with Vilmalia, but they were together in December 1998. (Tr. 5, pp. 73-34, 76). According to Lebron's mother, Clebis did not leave New York and come to Massachusetts in 1998. She testified that Vilmalia told

---

[4] The language on cross-examination is a little strained because an interpreter was used and the witness was referred to in the third person.

9

R.-12

her that he had left for two days. (Tr. 5, pp. 76-78). Mrs. Lebron learned from Vilmalia that her son was arrested about five days after the fact. (Tr. 5, pp. 76-77). She said that her son worked in "packing" in New Jersey, but she did not know where. (Tr. 5, p. 75,77).

The defendant, Clebis Lebron, acknowledged that, as of June 2000, he had been living in Massachusetts and running Moises Market for two years (Tr. 5, pp. 85, 89). Lebron denied having obtained the business certificate for the market in 1996, and denied that the signature on the business certificate was his. (Tr. 5, pp. 85-86, 100). Over objection, Lebron claimed that Silvio Ali had asked him to open the Fleet Bank account because Silvio Ali was not in this country legally. (Tr. 5, p. 87). Lebron testified that Ali's sister (Vilmalia) asked Lebron to help Silvio open a bank account in 1996, and Lebron did so. (Tr. 5, pp. 91-92). In December of 1998, Vilmalia asked Lebron to travel to Springfield. At her behest, Lebron arrived in Springfield and worked in the market with Silfredo Ali from December 8th until his arrest on December 11th. (Tr. 5, pp. 93-94).

Despite the Commonwealth's strenuous objection that there had been no notice of the defense of alibi, the defendant introduced pay stubs and a tax return from New Jersey for 1998. (Tr. 5, pp. 95-97). When confronted with the booking sheet indicating that Lebron had told the police he lived at 137-139

10

R.-13