UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
**SILFREDO ALI**                    )
  **Petitioner,**                   )
                                    )
**v.**                              )          **Civil Action No. 04-30005-KPN**
                                    )
**COMMONWEALTH OF MASSACHUSETTS**   )
  **ET AL.,**                       )
  **Respondents.**                  )
_____ )

**MEMORANDUM OF THE RESPONDENT IN OPPOSITION
TO THE PETITION FOR WRIT OF HABEAS CORPUS**

The respondent submits this memorandum in opposition to the petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by the petitioner, Silfredo Ali, who was convicted in 2000 for cocaine trafficking. His conviction was affirmed by the Massachusetts Appeals Court in *Commonwealth v. Lebron (and Two Companion Cases)*, 56 Mass. App. Ct. 1116, 780 N.,E. 2d 488 (2002)(Supp. Ans. Exh. 3) and his Application for Leave to Obtain Further Appellate Review (ALOFAR) in the Supreme Judicial Court (SJC) was subsequently denied. *Commonwealth v. Lebron*, 438 Mass. 1109, 785 N.E. 2d 382 (2003)(Supp. Ans. Exh. 4).

The petitioner bases his claim for federal habeas corpus relief on one ground, i.e., whether the trial judge's erred in denying his motion for a required finding of not guilty. He alleges that the evidence was insufficient to permit a jury to find him guilty of cocaine trafficking beyond a reasonable doubt. (Petition, p. 5, ¶ 12A-12B). It is the respondent's position the Massachusetts Appeals Court adjudication of this claim was not contrary to nor an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979). The Appeals

2

Court considered the evidence at trial, together with all reasonable and possible inferences that might properly be drawn from it, and agreed with the judge's assessment that any rational trier of fact could have found the elements of the crime charged beyond a reasonable doubt. *See Commonwealth v. Latimore*, 378 Mass. 671, 677 (1979). The petition for writ of habeas corpus should be denied.

## STATEMENT OF THE CASE

The respondent is not dissatisfied with the petitioner's Statement of the Case.

## STATEMENT OF FACTS

The Massachusetts Appeals Court reviewed the transcripts of the petitioner's trial and, based on its review, "accepted the well-documented statement of facts set out in the Commonwealth's memorandum of law in support of its motion for summary judgment (at 1-12)." *Commonwealth v. Lebron (and Two Companion Cases)*, 56 Mass. App. Ct. 1116, 780 N.,E. 2d 488 (2002)(Supp. Ans. Exh. 3). The following Statement of Facts was adopted by the Appeals Court from the Commonwealth's Memorandum and is entitled to a presumption of correctness under 28 U.S.C. § 2254 (e)(1). (Exh. 2 at 1-12). *Gunter v. Maloney*, 291 F. 3d 764, 76 (1st Cir. 2002). *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *Avellar v. DuBois*, 30 F.Supp.2d 76, 79 (D.Mass. 1998); *Otsuki v. DuBois*, 994 F.Supp. 48, 51 & n.3 (D.Mass. 1998); *cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (1981) (holding that the presumption of correctness under former habeas statute applied to "factual determinations made by state courts, whether the court be a trial court or appellate court"). This deference extends to inferences drawn by the state court from those factual determinations as well. *See Parke v. Raley*, 506 U.S. 20, 35 (1992); *Flores v. Marshall*, 53 F.

3

Supp. 2d 509, 514 (D. Mass. 1999).

**The Commonwealth's Case**

Sometime in October of 1998, members of the narcotics bureau began investigating activities at two locations, Moises Market, located at 150 Belmont Avenue, and a three family dwelling located l37-l39 Orange Street in Springfield.  (Tr. 3, pp.122-123)[1]. Initially, two males, Clebis Lebron and Franklin Garcia, were the "targets" of the investigation.   (Tr. 3, pp. 195-196; Tr. 4, pp. 79-80).  "Clevy" or "Cleby" and "Frankie" were the names given to the police by the informant.   (Tr. 3, pp. 201, 203)

When police checked the business records on file in the City Clerk's Office, they confirmed that in 1996 a business certificate had been issued for Moises Market, listing "Clevy" Lebron as the "conductor of business" at Moises Market, 150 Belmont Avenue. (Tr. 3, pp. 179-133; Tr. 4, pp. 76-77; C.A. 9).

Officers Lozado and Kervick conducted periodic surveillance of Moises Market, usually trying to observe the market around closing time in order to determine who had keys to the store and to follow the workers as they left the market.  (Tr. 3, p. 125; Tr. 4, P. 108).  Initially, the observations focused on "Cleby" or "Clevy" Lebron and Franklin Garcia.[2]  Officer Lozado testified that he first noticed Lebron in the market towards the end of October 1998.   During October and November, he observed Lebron behind the

---

[1] **References in the Statement of Facts are as follows:  Tr. 1, p. 1  refers to the Transcript volume number and page number; Def. Ali Br. 1 refers to the Brief submitted by the [petitioner], Silfredo Ali; C.A. 1 refers to the Commonwealth's Record Appendix, page number.**

[2] **Franklin Garcia was arrested and charged along with Lebron and Ali, but was in default at the time of trial and remains in default as of March 2002. (C.A. 10)**

4

counter of the market at least five or six times. (Tr. 3, pp. 127, 179; Tr. 4, p. 108). Lozado saw Lebron using keys to lock up the market at closing (Tr. 3, p. 130, 185), and he followed Lebron from 150 Belmont Avenue to 137-139 Orange Street about three times. Lozado testified that one time Lebron stayed at the Orange Street apartment for the night. More frequently, Lebron would go to the third floor apartment for brief periods of time, five or ten minutes, and then return to the market. (Tr. 3, pp. 128-129, 193). Usually Lebron would park out in front of 137-139 Orange Street and walk down the driveway to the rear of the house, setting off the motion detector lights. After Lebron entered the building, lights would go on in the third floor apartment and remain on for a brief period of time. The lights would go out, Lebron would reappear, get in the car, and return to the market. (Tr. 4, pp. 81-82; Tr. 5, pp. 20-21, 37-38). Lozado also observed Franklin Garcia at Moises Market and saw Garcia make quick trips to and from the market and 137-139 Orange Street. (Tr. 3, p. 130; Tr. 4, p. 81)

On December 7, 1998, Officer Efantis was assigned to mobile surveillance of 150 Belmont Avenue. He followed a car, registered to Silvio Ali, driven by a Hispanic male from 150 Belmont Avenue to 137-139 Orange Street. (Tr. 5, pp. 20-21, 31).[3] Officer Efantis contacted Officer Brian Moriarty, who was assigned to surveillance at 137-139 Orange Street at the time. Officer Moriarty identified Clebis Lebron as the man he saw arrive in that car, stay a short time, and leave. (Tr. 5, pp. 37-38)

---

[3] It was later determined that Silvio Ali was the petitioner's brother. Silvio Ali was seen working in the market during the early stages of the investigation. However, he was arrested on November 5, 1998 and was "out of the picture" for the rest of the investigation. (Tr. 3, p. 184; Tr. 4, pp. 183-184). The record does not reveal the reason for the arrest of Silvio Ali, but it does not appear to be related to this investigation.

5

The petitioner, Silfredo Ali, also referred to as "Freddie" (Tr. 4, p. 80) was observed in the market late in November or in early December, and was in the market when the search warrant was executed on December 11, 1998. (Tr. 3, p. 132; Tr. 4, p. 82). [The petitioner's] activities appeared to be consistent with working in the market, and [the petitioner] was also observed traveling to and from the market and 137-139 Orange Street. On one occasion, [the petitioner] was observed staying at the Orange Street address for about one hour. Other times, he remained there for only ten or fifteen minutes before returning to Moises Market at 150 Belmont Avenue. (Tr. 4, pp. 82-83, 85).

Police sought and obtained search warrants for both Moises Market at 150 Belmont Avenue and the third floor apartment at 137-139 Orange Street. The warrants were executed simultaneously on December 11, 1998.

Officers Lozado, Maldonado, Petrie and Tardiff arrived at 150 Belmont Avenue at about 6:15 or 6:30 P.M. Both Clebis Lebron and Silfredo Ali were behind the counter when the police arrived. Lebron and Ali were advised that the police had a search warrant for the premises. They were handcuffed and secured. (Tr. 3, 123-133). A search of Lebron revealed two keys to the market and $53.00. (Tr. 3, pp. 134-135, 185, 190, 209). [The petitioner} had $100 on his person. (Tr. 3, p. 165). $276 was taken from the cash register, and $58 was found in a sugar box behind the counter. (Tr. 3, pp. 208-209)

Officer Lozado went down into the basement. He observed Officer Maldonado[4] recover paper bags secreted between crates set up next to a bed in the basement. The

---

[4] Officer Maldonado did not testify at trial because he was on military leave. (Tr. 3, pp. 132-133).

**6**

paper bags contained plastic bags, which contained white powder. (Tr. 3, pp. 135—138, 191-192). The powder was analyzed and determined to be 42.05 grams of cocaine. (C.A. 5). Some paperwork was also recovered from the market. One envelope was addressed to Clebis Lebron at Moises Market, 150 Belmont Avenue. (Tr. 3, pp. 188-189). Bank statements (Ex. #2) were also recovered from the market. (Tr. 3, pp. 209-210). There was a stipulation that all of the checks contained in the statements seized from the market were signed by Silvio Ali. (Tr. 3, pp. 222-223). The telephone bill and title to a Chevrolet van which were seized were also in the name of Silvio Ali. (Tr. 3, p. 224).

At about the same time, a team of police officers arrived at 137-139 Orange Street to execute a search warrant for the third floor apartment. They met Franklin Garcia on the steps as they were going up to the apartment. Garcia was secured, searched and arrested. (Tr. 4, pp. 47, 88). Officer Michael Dowd went to the back bedroom where he observed three piles of cocaine on plates on the floor. A vise and a lamp were also on the floor next to the plates with the piles of cocaine. There was packaging material in the immediate vicinity. (Tr. 3, pp. 230-237; Tr. 4, pp. 48-50, 89). There were razor blades and cards to cut and mix cocaine, sifters, a digital scale, duct tape and a ledger found in that room. (Tr. 3, pp. 242-252; Tr. 4, pp. 53-58). Cocaine encased in packaging material was clamped into the vise. Lt. Cook, who had substantial experience in narcotics investigations, explained that after cocaine was diluted it would be repackaged and the vise would be used to press it back into a hard lump to make it appear to be straight from the kilo. (Tr. 4, pp. 50-51, 90). The three piles of cocaine weighed 2.25 grams, 57.61 grams and 51.74 grams respectively. (C.A. 1, 2, 8). In that same bedroom, two more bags of cocaine were found in two separate

7

gym bags next to the bed.  One bag contained 3.38 grams of cocaine and the other contained 8.85 grams of cocaine.  (Tr. 3, pp. 238-241; C.A. 3, 4).

Officer Tiyra Johnson searched the middle room, which appeared to be the living room.  She found currency in the amount of $573 along with receipts and coins in a box in the closet.  (Tr. 4, pp. 12-13).  Officer Johnson also looked, under the mattress in the rear bedroom and found what appeared to be a "drug ledger." (Tr. 4, pp. 13-14).

Officer Witherspoon searched the front bedroom.  He found a bag containing 4.35 grams of cocaine in the pocket of pants hanging in the closet.  (C.A. 6).  On the shelf right above those pants, he found prescription bottles and two prescriptions in the name of Silfredo Ali, dated November 16, 1998.  (Tr. 4, pp. 19, 23; C.A. 7).

Officer Pedro Soler searched what appeared to be a storage closet off the middle room.  There was a box with many personal papers, including the phone bill for 150 Belmont Avenue and an insurance policy for 150 Belmont Avenue.  (Tr. 4, pp. 27-28, 36, 42).  These documents were in the name Silvio Ali.  (Tr. 4, p. 37).  There was also a bank statement addressed to Clebis Lebron, dba Moises Grocery, 150 Belmont Avenue.  (Tr. 4, p. 38).  The parties stipulated that the checks in the statement were not signed by Clebis Lebron.  (Tr. 4, p. 40).

Officer Soler searched the kitchen where he found materials commonly used for packaging drugs in the trash can.  There were many "blowouts," or plastic sandwich baggies with the corners torn off. (Tr. 4, pp. 30-32, 51).  In addition to the orange sifter found in the rear bedroom, two more sifters were seized from the kitchen.  (Tr. 4, p. 34)

8

On cross-examination of Officer Kervick, counsel for [the petitioner] elicited testimony that [the petitioner] had given a Holyoke address and occupation at the time of booking.  (Tr. 4, pp. 194-195, 203).

According to the analyses, 42.05 grams of cocaine were seized from 150 Belmont Avenue (C.A. 5), and a total of 128.18 grams of cocaine from 137-139 Orange Street.  (C.A. 1,2,3,4,6,8).

## Clebis Lebron's Case

Lennox Stamp testified that he had owned the property located at 150 Belmont Avenue for about ten years.  He leased it to "a guy on Main Street, and the lease was open." (Jr. 5, p. 56).  Some time before 1998, the lease was assigned to Silvio Ali.  (Tr. 5, pp. 55-56) Mr. Stamp testified that he still owned the property and that, as of June 23, 2000, the property was being utilized by Clebis Lebron as a variety store, named Moises Market. (Tr. 5, p. 56)

Mr. Stamp had met Silvio Ali and knew Frankie Garcia but was vague about whether he knew any other people in the courtroom.  (Tr. 5, p. 57).  He did not see Clebis Lebron at 150 Belmont Avenue.  (Tr. 5, pp. 57-58).  Stamp testified that he met Lebron through Lebron's wife, whose name he did not know because he "only dealt with her a couple of time and because they're Spanish." (Tr. 5, p. 58).

Juan Rondon testified that he lived on the second floor at 137-139 Orange Street, property owned by his wife and daughter.  (Tr. 5, p. 61).  Sometime in the fall of 1998, he rented the third floor apartment to Silvio Ali.  Franklin Garcia and [the petitioner] also lived there.  (Tr. 5, pp. 61-62).  Clebis Lebron did not live there in November or December

9

1998, although he did see Lebron there twice after the raid. Lebron stayed there with his wife, Silvio's sister. (Tr. 5, pp. 62-66). On cross-examination,[5] Rondon testified that he entered into a verbal lease with Ali in April or May of 1998. (Tr. 5, p. 68). Silvio worked at a store on Belmont with Franklin Garcia. (Tr. 5, pp. 68-69). Rondon saw [the petitioner] at Orange Street at various times of the day, three or four times a week. (Tr. 5, p. 69).

The defendant Lebron offered testimony in the nature of an alibi. It should be noted that there was no notice of the defense of alibi and the Commonwealth strenuously objected to the receipt of this evidence. (Tr. 3,pp. 12-20; Tr. 4, pp. 110-132, 138-139).

Marcella Lebron, Clebis Lebron's mother, testified that she lived in the Bronx, New York. (Tr. 5, p. 72). She testified that her son lived with her in New York in December 1998. (Tr. 5, p. 73). Immediately thereafter, she testified that in 1998 Clebis Lebron lived with his girlfriend, Vilmalia, and their son at Vilmalia's apartment, which was not close to hers. Clebis would live with his mother when he had problems with Vilmalia, but they were together in December 1998. (Tr. 5, pp. 73-34, 76). According to Lebron's mother, Clebis did not leave New York and come to Massachusetts in 1998. She testified that Vilmalia told her that he had left for two days. (Tr. 5, pp. 76-78). Mrs. Lebron learned from Vilmalia that her son was arrested about five days after the fact. (Tr. 5, pp. 76-77). She said that her son worked in "packing" in New Jersey, but she did not know where. (Tr. 5, p. 75,77).

---

[5] The language on cross-examination is a little strained because an interpreter was used and the witness was referred to in the third person.

10

The defendant, Clebis Lebron, acknowledged that, as of June 2000, he had been living in Massachusetts and running Moises Market for two years (Tr. 5, pp. 85, 89). Lebron denied having obtained the business certificate for the market in 1996, and denied that the signature on the business certificate was his. (Tr. 5, pp. 85-86, 100). Over objection, Lebron claimed that Silvio Ali had asked him to open the Fleet Bank account because Silvio Alt was not in this country legally. (Tr. 5, p. 87). Lebron testified that Ali's sister (Vilmalia) asked Lebron to help Silvio open a bank account in 1996, and Lebron did so. (Tr. 5, pp. 91-92). In December of 1998, Vilmalia asked Lebron to travel to Springfield. At her behest, Lebron arrived in Springfield and worked in the market with [the petitioner] from December 8th until his arrest on December 11th. (Tr. 5, pp. 93-94).

Despite the Commonwealth's strenuous objection that there had been no notice of the defense of alibi, Lebron introduced pay stubs and a tax return from New Jersey for 1998. (Tr. 5, pp. 95-97). When confronted with the booking sheet indicating that Lebron had told the police he lived at 137-139 Orange Street at the time of his arrest, the defendant Lebron denied ever having given that address. (Tr. 5, pp. 101—102). Lebron testified that his relationship with Vilmalia ended "after this problem happened." (Tr. 5, p. 81).

[The Petitioner]'s Case

[The petitioner] testified that in 1998 he lived alone in Holyoke at 393 High Street. (Tr. 5, pp. 104-105). At that time, he worked as a kitchen helper at the Salsa Renge restaurant, also in Holyoke. (Tr. 5, 106). He denied ever living at Orange Street, but said that he visited his brother Silvio there. Franklin Garcia lived at 137-139 Orange Street, as had someone named Jose. (Tr. 5, p. 107). Silvio worked in Moises Market, but did not own

11

it, as far as [the petitioner] knew.  [The petitioner] did not work there.  (Tr. 5, p. 108).  [The petitioner] denied ever going to the basement of 150 Belmont Avenue.  He also denied ever seeing drugs at either 150 Belmont Avenue or Orange Street.  (Tr. 5, p. 110).  [The petitioner]  did not know how his pills or prescriptions got into the bedroom closet in the Orange Street apartment.  (Tr. 5, p. 113).

<u>Commonwealth's Rebuttal</u>

William J. Metzger, City Clerk for the City of Springfield, provided the foundation for the introduction of the certified copy of the business certificate filed pursuant to G.L. c. 110, §5. (Tr. 5, pp. 115-117).  He testified that in the normal course of business, the person seeking to obtain the certificate would supply the information and then affirm under oath that the information contained on the form was true.  (Tr. 5, p. 117) Exhibit #36 is dated May 14, 1996 and bears the name Clevy Lebron.  (Tr. 5, pp. 116, 118; C.A. 9).  No identification is necessary to obtain a certificate.  An illegal alien with no Social Security number would be able to obtain a certificate.  (Tr. 5, p. 119).

<u>ARGUMENT</u>

**THE STATE COURT ADJUDICATION OF THE PETITIONER'S SUFFICIENCY OF THE EVIDENCE CLAIM WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF *JACKSON V. VIRGINIA*, 443 U.S. 307 (1979).**

Because the petition for writ of habeas corpus was filed after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), this Court's review of the petitioner's claims is governed by that statute.  *Lindh v. Murphy,* 521 U.S. 320, 336 (1997).  The relevant statutory provision, 28 U.S.C. § 2254(d)(1), states:

12

**(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—**

> **(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States**

In *Williams v. Taylor,* 529 U.S. 362, 412 (2000) (O'Connor, J., Opinion of the Court) the Supreme Court gave independent meaning to both the "contrary to" and the "unreasonable application" clauses of the statute. *See id.* at 405. Under the first prong of § 2254(d)(1), the Court stated that a decision may be "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), in two ways. First, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams,* 529 U.S. at 405. Second, "[a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 405-406. [6]

Under the second prong of § 2254(d)(1), "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular

---

[6] The court interpreted the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," a phrase shared by both clauses, to "refer[] to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. The statute thus "restricts the source of clearly established law" to the Supreme Court's holdings. *Id.*

13

prisoner's case" qualifies as "'an unreasonable application of . . . clearly established Federal law.'"  *Id.* at 407 (quoting 2254(d)(1)).  In determining whether a state-court decision unreasonably applies Supreme Court precedent, "a federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409.  As the Court stressed, "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Id.* at 410 (emphasis in original).  Under the "unreasonable application" clause,  a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable. *Id.* at 411.  The First Circuit has explained the degree of error that must be shown by the petitioner to reach the level of an "objectively unreasonable" state court decision.  "[S]ome increment of incorrectness beyond error is required….The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

In its decision, the Massachusetts Appeals Court adopted the historical facts and legal reasoning of the Commonwealth in rejecting the petitioner's evidentiary sufficiency claim.  The Commonwealth had invoked the well-established test of *Jackson v. Virginia*, 443 U.S. 307 (1979), and its state counterpart, *Commonwealth v. Latimore*, 378 Mass. 671, 677 (1979), in assessing sufficiency of the evidence claims, i.e, whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have

14

found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319 (emphasis in original)(Exh. 3 at p. 3). Since the court identified and applied the correct governing legal principle from Supreme Court precedent, its decision cannot not be "contrary to" clearly established Supreme Court law. *Hurtado v. Tucker*, 245 F. 3d 7, 15 (1st Cir. 2001). Thus this Court must analyze whether it constitutes an unreasonable application of clearly Supreme Court law, that is, whether the Appeals Court's ultimate conclusion - that there was sufficient evidence of the petitioner's trafficking in cocaine- was "objectively unreasonable." *Id.*

In *Hurtado*, the First Circuit suggested guidelines "as to some, but not all, of the principles in an insufficiency-of-the-evidence case to be used in making the evaluation of "objective unreasonableness" under 2254(d)(1)(1). *Hurtado*, 245 F. 3d at 28. The focus of the inquiry is on the state court decision and the federal habeas court must itself look to "the totality of the evidence" in evaluating the state court's decision. *Id.* The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable. The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable but the absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness. *Id.* Applying these standards it is clear that the Appeals Court addressed the central issue of sufficiency of the evidence after reviewing the record itself and did not ignore material evidence or any key arguments made by the petitioner. *See Kilburn v. Maloney*, 383 F. Supp. 2d 247, 259

15

(D. Mass. 2005).

Under *Jackson*, a reviewing court does not weigh the evidence, and "must accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Kelly v. Roberts*, 998 F.2d 802, 808 (10th Cir. 1993). Nor should it "reread the record from the petitioner's perspective", *Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F. 2d 491, 493 (1st Cir.), *cert. denied,* 493 U.S. 865 (1989), or make its own subjective determination of guilt or innocence, *Herrera v. Collins*, 506 U.S. 390, 401(1993), *quoting Jackson*, 443 U.S. at 318-319. When evaluating the sufficiency of the evidence, a habeas court must accept the state law on permissive inferences that may be drawn by the jury once a primary fact has been established. *See Wright v. West*, 505 U.S. at 282 (state law permitted inference that a person who fails to explain, or falsely explains his exclusive possession of recently stolen property is the thief). This is precisely what the Supreme Court said in *Jackson.*

> Under the standard established . . . as necessary to preserve the due process protection recognized in <u>Winship</u>, a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

443 U.S. at 326; *Wright v. West*, 505 U.S. 277, 296-297 (1992).

"It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts." (Emphasis supplied). *Jackson,* 443 U.S. at 319; *See Ford v. Ahitow*, 104 F. 3d 926 (7th Cir. 1997) (role of appellate court limited since it cannot reweigh evidence or substitute its judgment for that of fact finder).

16

The Appeals Court adjudication of the petitioner's case was not objectively unreasonable under *Jackson*. Sufficiency of the evidence is reviewed with specific reference to the substantive elements of the offense as defined in state law. *Jackson*, 443 U.S. at 324 n.16; *Campbell v. Fair*, 838 F. 2d 1, 4 (1st Cir.). The petitioner was convicted on two indictments of cocaine trafficking. Indictment 99-815 charged trafficking in cocaine in an amount less that 200 grams and relates to the drugs found at an apartment located at 137-139 Orange Street in Springfield, Massachusetts. Indictment 99-816 charged trafficking in an amount less than 100 grams and relates to cocaine found at Moises Market at 150 Belmont Avenue, also in Springfield.[7]

The Massachusetts Appeals Court's adjudication of the petitioner's evidentiary sufficiency claim incorporated the reasoning and legal conclusions of the Commonwealth in its Memorandum of Law in Support of Its Motion for Summary Judgment. (Supp. Ans. Exh. 3). The Commonwealth had submitted the case to the jury on the theory of joint venture, alleging that both Lebron and the petitioner had constructive possession of the drugs in both locations. It was the Commonwealth's theory that the cocaine was sold from the market and that the Orange Street apartment was used as a "warehouse" to store the drugs prior to sale. (Tr. 3, pp. 104-105; Tr. 5, p. 160). The Commonwealth maintained, and the Appeals Court agreed, that the evidence presented, together with the reasonable inferences that might be drawn therefrom, was sufficient to satisfy any rational trier of fact

---

[7] The petitioner was sentenced to a maximum of ten years and one day in state prison on the Orange Street indictment (Ind. 99-815) and five years and one day maximum for the Moises Market indictment (Ind. 99-816), to be served concurrently with the prior sentence.

17

that the petitioner did exercise dominion and control over the cocaine at both locations, and that he did intend to distribute the cocaine.  (Supp. Ans. Exh. 2 at 13).

The case against the petitioner involved constructive possession of narcotics.  Under Massachusetts law,  "[p]ossession may be constructive rather than actual; it may be joint and not exclusive; and it may be proved by circumstantial evidence," *Commonwealth v. Acosta*, 416 Mass. 279, 284, 627 N.E.2d 466 (1993), *quoting Commonwealth v. Yazbeck*, 31 Mass. App. Ct. 769, 775, 583 N.E. 2d 901 (1992).  To support a claim of constructive possession, the petitioner must have known of the presence of the cocaine at Moises Market and in the Orange Street apartment and must have had the ability and intention to exercise dominion and control over it.  *Commonwealth v. Cruz*, 34 Mass. App. Ct. 619, 621, 614 N.E.2d 702 (1993).  "While presence in an area where contraband is found 'alone cannot show the requisite knowledge, power or intention to exercise control over the [contraband], . . . presence, supplemented by other  incriminating evidence "will serve to tip the scale in favor of sufficiency.'"  *Commonwealth v. Brezezinski*, 405 Mass.  401, 409-410, 540 N.E. 2d 1325 (1989), citing *Commonwealth v. Albano*, 373 Mass. 132, 134, 365 N.E. 2d 808 (1977).  The elements of control and power or knowledge, coupled with the ability and intention to exercise dominion and control may be inferred from circumstantial evidence which, in terms of practical experience of the conduct of human beings, points to such a finding." *Commonwealth v. Brown*, 34 Mass. App. Ct. 222, 225,  609 N.E.2d 100 (1993).  Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." *Commonwealth v. James,* 30 Mass. App. Ct. 490, 498, 570 N.E.2d 168 (1991).  "[T]he line that separates mere

18

knowledge of unlawful conduct and participation in it, is "often vague and uncertain.  It is

within the province of the jury to determine from the evidence whether a particular

defendant [has] crossed that line." *Commonwealth v. Cerverny*, 387 Mass. 280, 287, 439 N.E.

2d. 754 (1982), *quoting Commonwealth v. Beneficial Financial Company,*  360 Mass. 188,

250, 275 N.E. 2d 33 (1971), *cert. denied sub nom., Farrell v. Massachusetts*, 407 U.S. 910, and

*Beneficial Financial Company v. Massachusetts*, 407 U.S.  914 (1972).

As the Commonwealth suggested and the Appeals Court found, evidence of the

police observations gave rise to a reasonable inference that the petitioner as well as Lebron

exercised dominion and control over the market and the contents thereof.  *See*

*Commonwealth v. Gonzales*, 42 Mass. App. Ct. at 238 (occupancy permits attribution

knowledge of paraphernalia found in the kitchen); *Commonwealth v. Rivera,* 31 Mass. App.

Ct. 554, 557 (1991) (one who uses kitchen usually familiar with contents).  Lebron was the

name on the business certificate of the market and he was observed using the keys to lock

the store.  Both Lebron and the petitioner  were present behind the counter in Moises

Market when the police arrived to execute the search warrant.   His presence,

supplemented by other incriminating evidence detailed below, tipped the scale in favor of

sufficiency. *Commonwealth v. Clarke*, 44 Mass. App. Ct. 502, 505 (1998).

The petitioner was observed in the market late in November or in early December,

and his activities appeared to be consistent with working in the market.  He was also

observed traveling to and from the market and 137-139 Orange Street.  On one occasion,

the petitioner stayed at the Orange Street address for about one hour.  Other times, he

remained there for only ten or fifteen minutes before returning to Moises Market at 150

19

Belmont Avenue.  His presence where illicit drugs where found plus these other facts were sufficient under Massachusetts law to prove that both defendants were in constructive possession of the cocaine found in the basement of 150 Belmont Avenue.  An inference could be drawn that the petitioner worked in the market, was aware of the drugs in the basement and was seen going to the Orange Street apartment in order to transfer cocaine from the large supply there to the Moises Market to keep up with the demand for drugs by his and Lebron's customers.   Logic also dictates that only trusted participants in a drug trade would have access to the large stash of cocaine and trafficking paraphernalia discovered at Orange Street where the petitioner lived and the satellite cache of drugs seized in the market where the petitioner worked.

        The Appeals Court also found that the evidence established a connection between 150 Belmont Avenue and 137-139 Orange Street.  Police officers observed Clebis Lebron, Franklin Garcia and the petitioner traveling to and from 150 Belmont Avenue and 137-139 Orange Street.  Often their visits to Orange Street were brief, only five or ten minutes, with an immediate return to 150 Belmont Avenue.  The telephone bill and insurance papers for 150 Belmont Avenue were found at 137-139 Orange Street.  Thus, the evidence linked 150 Belmont Avenue to the third floor apartment at 137-139 Orange Street, where a large quantity of cocaine and drug paraphernalia were found out in the open.  Given the brevity of the visits and the vast quantities of cocaine and paraphernalia associated with distribution found at 137-139 Orange Street, the evidence supported the reasonable inference that the petitioner and his companions went to the Orange Street address to replenish the supply of cocaine as needed at 150 Belmont Avenue.

20

The evidence also linked the petitioner directly to the third floor apartment of 137-139 Orange Street.  In the front bedroom, his pills and two prescriptions were found in a closet right above pants which had 4.35 grams of cocaine in the pocket.  The inside of the apartment was a "virtual wasteland" of drugs and packaging paraphernalia. *Commonwealth v. Sabetti*, 411 Mass. at 776-780.  Thus, "the jury properly could infer, on the basis of this evidence, that the petitioner knew of the contraband and the plainly visible bags of cocaine and therefore could properly have been found constructively to possess the same." *Commonwealth v. Sabetti*, 411 Mass at 778.   As the Commonwealth argued and the Appeals Court so found,  these facts, in the aggregate, were sufficient for the jury to infer, in light of common experience that the petitioner was in constructive possession of the entire stash in the apartment, either alone or jointly with others or he was a joint venturer with the two others in the apartment.  (Citations omitted). (Supp. Ans. Exh. 3 at 17).

The location of cocaine gives rise to an inference of awareness of the drugs.  See *Commonwealth v. Ramos*, 51 Mass. App. Ct. at 902.  The fact that the petitioner  was seen coming and going, and the presence of his prescriptions supports the inference that he exercised dominion or control over the apartment and/or its contents and constituted evidence giving rise to a reasonable inference that there was a connection between the petitioner and the apartment.  *See Commonwealth v. Delarosa*, 50 Mass. App. Ct. at 627. The evidence was sufficient to impute knowledge of the cocaine at 150 Belmont Avenue to both the petitioner and Lebron.

There was also sufficient evidence to establish that the petitioner was aware of the cocaine at 137-139 Orange Street.  Juan Rondon, who lived in the second floor apartment

21

of 137-139 Orange Street, testified that the petitioner lived in the third floor apartment at that address and he saw the petitioner at Orange Street at various times of the day, three or four times a week. "A defendant's 'residential status at a premises is a relevant inculpatory factor to be considered in determining whether he can be regarded as being in constructive possession of contraband found on the premises, since it indicates more than mere presence.'" *Commonwealth v. Clarke*, 44 Mass. App. Ct. 502, 505 (1998), citing *Commonwealth v. Handy*, 30 Mass. App. Ct. 776, 781 n.5 (1991). It was, therefore, reasonable to conclude that the petitioner and Lebron had the ability and intent to exercise dominion and control of the drugs. *Commonwealth v. Gonzalez,* 42 Mass. App. Ct. 235, 237 (1997)

These factors plus the quantity of drugs, the scale, the sifters, the vise, the packaging materials and ledgers all support the reasonable inference that the petitioner and his friends intended to sell the cocaine found at each location. *Commonwealth v. Lopes*, 25 Mass. App. Ct. 998, 990 (1988). "The Government . . . need not exclude every reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt." *Commonwealth v. Merola*, 405 Mass. 529, (1989). See also *Commonwealth v. Montanez*, 410 Mass. 290, 306 (1991). (*Latimore* standard does not require Commonwealth to entirely eliminate the possibility that someone other than the defendant could have committed the crime).

In the Petitioner's Brief in Support of Application for Habeas Corpus, he asks this Court to undertake a "de novo" review of the case, weighing the evidence anew and assessing the credibility of the witnesses from a cold record. He asserts that he was merely

22

present when the drugs were discovered at Moises Market and Orange Street, ignoring the solid evidence and reasonable inferences therefrom that the jury drew from the testimony and exhibits. The petitioner has selected individual facts and viewed them from his own perspective without looking at the "totality" of the evidence before the jury which, when meshed with logical inferences, well supported the Commonwealth's case. The federal habeas court "when faced with a record of historical facts that support a conflicting inference must presume -- even if it does not affirmatively appear on the record -- that the trier of fact resolved such conflicts in favor of the prosecutor, and must defer to that resolution." *Duran v. Pepe*, 899 F. Supp. 839, 842 (D. Mass. 1995), *quoting Jackson*, 443 U. S. at 326. *See Herrera v. Collins*, 506 U.S. 390, 402 (1993)(the *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination but rather whether it made a rational decision to convict or acquit.)

Any rational juror could have found proof beyond a reasonable doubt given the facts found by the Appeal Court as to the petitioner's actions. *See infra.* A federal habeas petitioner may obtain relief only by demonstrating that the state court's adjudication on the merits of the claim involved an unreasonable application of *Jackson's* "no rational trier of fact" standard. *Garcia v. Carey*, 395 F.3d 1099, 1102 (9th Cir. 2004). AEDPA's deferential standard of review requires a habeas court not to determine whether the state courts were incorrect but whether they were unreasonable. *Trejo v. Hulick*, 380 F.3d 1031, 1032 (7th Cir. 2004)(en banc). *Accord Bruce v. Terhune*, 376 F.3d 950, 960 (9th Cir. 2004). The evidence against the petitioner was considerably greater than the evidence against the petitioner in *Hurtado* and the First Circuit in that case deferred to the state appellate's

23

court's adjudication.  Given the evidence and inferences cited above supporting the petitioner's guilt, the state court adjudication of his sufficiency of the evidence claim was not an objectively unreasonable application of *Jackson*.

## CONCLUSION

For the above stated reasons, the petition should be denied.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

/s/ Annette C. Benedetto
Annette C. Benedetto
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
BBO No. 037060

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the Electronic Case Filing system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on the date set forth below.

Dated: June 26, 2006                    /s/ Annette C. Benedetto
                                        Annette C. Benedetto